UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF WEST VIRGINIA

_____
)
UNITED STATES OF AMERICA, and )
)
THE STATE OF WEST VIRGINIA, by and through the )
WEST VIRGINIA DEPARTMENT OF )
ENVIRONMENTAL PROTECTION, )
)
        Plaintiffs, )
)
        v. )
)
LPG LAND & DEVELOPMENT )
CORPORATION, )
)
        Defendant. )
_____)

> ELECTRONICALLY FILED
> **03/08/2021**
> U.S. DISTRICT COURT
> Northern District of WV

Civil Action No. **1:21-CV-33 (Kleeh)**
_____

## COMPLAINT

Plaintiff United States of America, by authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request and on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), and Plaintiff the State of West Virginia by and through the West Virginia Department of Environmental Protection ("WVDEP"), file this Complaint and allege as follows:

## NATURE OF ACTION

1.     This is a civil action against LPG Land & Development Corporation ("LPG" or "Defendant") pursuant to Section 309(b) and (d) of the Clean Water Act ("CWA"), 33 U.S.C. § 1319(b) and (d), and Section 22 of the West Virginia Water Pollution Control Act ("WPCA"), W. Va. Code § 22-11-22. Plaintiffs allege that Defendant discharged and will continue to discharge pollutants into waters of the United States, and of the State, in violation of Section 301 of the CWA, 33 U.S.C. § 1311, and Section 8 of the WPCA, W. Va. Code § 22-11-8.

Specifically, Defendant has discharged pollutants, including fill material, storm water associated with construction activity, and chemical cleaning agents, surfactants and/or grease products to waters of the United States and waters of the State of West Virginia from point sources at the Mon Fayette Industrial Park ("the Site") located in Morgantown, Monongalia County, West Virginia, in violation of the CWA and WPCA. Plaintiffs also allege that Defendants are in violation of the conditions and limitations of National Pollutant Discharge Elimination System ("NPDES") permits issued by West Virginia pursuant to Section 402 of the CWA, 33 U.S.C. § 1342 and Section 8 of the WPCA, W. Va. Code § 22-11-8.

2.      In this action, the Plaintiffs seek: (1) to enjoin the unauthorized discharge of pollutants to waters of the United States and the waters of the State of West Virginia, from point sources at or from the Site; (2) to require Defendant to comply with the requirements of the CWA, the WPCA, their implementing regulations, and with the terms of Defendant's permit issued under CWA Section 402 and WPCA Section 8; (3) to require Defendant, at its own expense and at the direction of EPA and WVDEP, to restore and/or mitigate the impacts caused by the alleged unlawful activities; and (4) to require Defendant to pay civil penalties as provided in 33 U.S.C. § 1319(d) and W. Va. Code § 22-11-22.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, 1355, and 1367 and Section 309 of the CWA, 33 U.S.C. § 1319(b).

4.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1395, and Section 309(b) of the CWA, 33 U.S.C. § 1319(b), because the Defendant conducts business in this District, the subject Site is located in this District, and the violations that constitute the basis of this Complaint occurred in this District.

## AUTHORITY

5.      The United States has authority to bring this action on behalf of the Administrator of EPA under 28 U.S.C. §§ 516 and 519 and Section 506 of the CWA, 33 U.S.C. § 1366.  WVDEP has authority to bring this action pursuant to W. Va. Code § 22-11-22.

## DEFENDANT

6.      LPG is a domestic C corporation incorporated in the State of West Virginia in 2007 with a principal business address of 629 Fairchance Rd., Morgantown, West Virginia 26508.

7.      LPG owns and/or operates the Mon Fayette Industrial Park located in Morgantown, Monongalia County, West Virginia, that includes, but is not limited to, the property located at the following coordinates: 39.6869, -79.8371.

8.      LPG is a "person" within the meaning of Section 502(5) of the CWA, 33 U.S.C. § 1362(5) and Section 3(14) of the WPCA, W. Va. Code § 22-11-3(14).

9.      At all times relevant to this Complaint, LPG either owned or otherwise controlled and operated the Site and controlled or directed the activities relevant to this Complaint that occurred at the Site.

## STATUTORY AND REGULATORY BACKGROUND

### A.  CWA General Provisions

10.      The objective of the Clean Water Act is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

11.      To accomplish the objective of the CWA, Section 301(a), 33 U.S.C. § 1311(a), prohibits the "discharge of any pollutant" by any person to navigable waters unless that discharge is authorized by a permit issued under CWA Section 402 or 404, 33 U.S.C. §§ 1342 and 1344, or by other provisions of the CWA not applicable here.

12.     "Discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

13.     "Pollutant" means, among other things, solid waste, wrecked or discarded equipment, dredged spoil, rock, sand, cellar dirt, and industrial waste discharged into water. 33 U.S.C. § 1362(6).

14.     "Navigable waters" means "the waters of the United States." 33 U.S.C. § 1362(7).

15.     "Point source" means, among other things, "any discernable, confined and discrete conveyance…from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

16.     For purposes of the CWA, "person" means "an individual, corporation, partnership, [or] association." 33 U.S.C. § 1362(5).

**B. CWA Section 402**

17.     Under Section 402(a) of the CWA, EPA may issue National Pollutant Discharge Elimination System ("NPDES") permits for the discharge of any pollutant, or combination of pollutants, to the waters of the United States. 33 U.S.C. § 1342(a).

18.     Pursuant to Section 402(b) of the CWA, 33 U.S.C. § 1342(b), EPA may authorize a state as the permitting authority for Section 402 permits.

19.     In 1982, EPA granted the State of West Virginia the authority to issue NPDES permits for all areas of the State other than Indian country pursuant to Section 402(b) of the CWA, 33 U.S.C. § 1342(b).

20.     The West Virginia Department of Environmental Protection ("WVDEP") is authorized to issue NPDES permits within the State of West Virginia, pursuant to Section 402(b) of the CWA, 33 U.S.C. § 1342(b), and W. Va. Code §§ 22-1-5, 22-1-7, and 22-11-4(a)(1).

4

21.     West Virginia NPDES (hereinafter referred to as "WV/NPDES") permittees must comply with all conditions of their NPDES permits, and any permit noncompliance constitutes a violation of the CWA and the WPCA. 33 U.S.C. § 1311(a); 40 C.F.R. §§ 122.41(a) & 123.25(a); W. Va. Code § 22-11-8.

22.     Under Sections 309 and 402(i) of the CWA, 33 U.S.C. §§ 1319 and 1342(i), the United States retains concurrent authority within authorized states to enforce NPDES violations.

23.     Section 402(p) of the CWA, 33 U.S.C. § 1342(p), and 40 C.F.R. § 122.26 provide that facilities with discharges of storm water associated with industrial activity are subject to NPDES permitting requirements under Section 402(a) of the Act, 33 U.S.C. § 1342(a).

24.     EPA regulations define "storm-water discharge associated with industrial activity" to include, *inter alia*, "construction activity" and "small construction activity." 40 C.F.R. §§ 122.26(b)(14)(x) & 122.26(b)(15)(i).

25.     "Construction activity" includes "clearing, grading and excavation, except operations that result in the disturbance of less than five acres of total land area," although the definition also includes "the disturbance of less than five acres of total land area that is a part of a larger common plan of development or sale if the larger common plan will ultimately disturb five acres or more." 40 C.F.R. § 122.26(b)(14)(x).

26.     "Small construction activity" includes "clearing, grading, and excavating that result in land disturbance of equal to or greater than one acre and less than five acres" and "the disturbance of less than one acre of total land area that is part of a larger common plan of development or sale if the larger common plan will ultimately disturb equal to or greater than one and less than five acres." 40 C.F.R. § 122.26(b)(15)(i).

27.     "Storm water" is defined as "storm water runoff, snow-melt runoff, and surface runoff and drainage."  40 C.F.R. § 122.26(b)(13).

28.     Pursuant to Sections 308 and 402 of the CWA, 33 U.S.C. §§ 1318 and 1342, EPA promulgated storm water discharge regulations at 40 C.F.R. § 122.1 *et seq.* Dischargers of storm water associated with industrial activity are required to apply for an individual permit or seek coverage under a general permit.  33 U.S.C. § 1342(p)(2)(B);  40 C.F.R. § 122.26(c)(1).

**C.  CWA Section 404**

29.     Section 404(a) of the CWA, 33 U.S.C. § 1344(a), authorizes the Secretary of the Army, acting through the Chief of Engineers, U.S. Army Corps of Engineers, to issue permits for the discharge of dredged and/or fill material to navigable waters at specified disposal sites.

30.     "Fill material" is defined as any pollutant which replaces portions of the waters of the United States with dry land or which changes elevation of a water body for any purpose. 40 C.F.R. § 232.2.

**D.  CWA Enforcement Provisions**

31.     Section 309(b) of the CWA, 33 U.S.C. § 1319(b), authorizes the Administrator of EPA to commence a civil action for appropriate relief, including a permanent or temporary injunction, against any person who violates Section 301 of the CWA, 33 U.S.C. § 1311, or any condition or limitation of a permit issued under CWA Section 402, 33 U.S.C. § 1342, or CWA Section 404, 33 U.S.C. § 1344, including state permits issued under an approved permit program.

32.     Section 309(d) of the CWA, 33 U.S.C. § 1319(d), authorizes the commencement of an action for civil penalties against any person who violates CWA Section 301, 33 U.S.C. § 1311, or any condition or limitation in a permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

33.     Section 309(d) of the CWA, 33 U.S.C. § 1319(d), establishes civil penalties for violations of the CWA payable to the United States of up to $25,000 per day for each violation. Section 309(d) of the CWA further specifies that in determining the amount of a civil penalty, a court "shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require." 33 U.S.C. § 1319(d).

34.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990 (Pub. L. No. 101-410), as amended by the Debt Collection Improvement Act of 1996 (Pub. L. No. 104-134, Sec. 31001(s)), and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 (28 U.S.C. § 2461 note), as reflected in the Civil Monetary Penalty Inflation Adjustment Rule, 40 C.F.R. Part 19, EPA may seek civil penalties of up to $37,500 per day for each violation occurring after January 12, 2009, through November 2, 2015, and up to $55,800 per day per violation of the CWA for violations occurring after November 2, 2015. 40 C.F.R. § 19.4.

**E.  WPCA Provisions**

35.     Section 8 of the WPCA, W. Va. Code § 22-11-8, prohibits, *inter alia*, the discharge of any pollutant by any person into waters of the State of West Virginia, unless the discharge is in compliance with all applicable water quality standards and all requirements of a NPDES permit issued pursuant to the WPCA.

36.     Section 3 of the WPCA, W. Va. Code § 22-11-3(16), defines "pollutant" as, inter alia, "industrial wastes" and "other wastes," which include "any liquid, gaseous, solid or other waste substance, or a combination thereof, resulting from or incidental to any process of industry, manufacturing, trade or business, or from or incidental to the development, processing

7

or recovery of any natural resources" and "all other materials and substances not sewage or industrial wastes which may cause or might reasonably be expected to cause or to contribute to the pollution of any of the waters of the state."

37.     "Waters of the State of West Virginia" means any and all water on or beneath the surface of the ground, whether percolating, standing, diffused or flowing, wholly or partially within this state, or bordering this state and within its jurisdiction, and includes, without limiting the generality of the foregoing, natural or artificial lakes, rivers, streams, creeks, branches, brooks, ponds (except farm ponds, industrial settling basins and ponds and water treatment facilities), impounding reservoirs, springs, wells, watercourses and wetlands. W. Va. Code Ann. § 22-11-3(23).

38.     Section 8 of the WPCA, W. Va. Code § 22-11-8(b)(1), prohibits any person, unless the person obtains a WV/NPDES permit, from allowing sewage, industrial wastes or other wastes, or the effluent therefrom, produced by or emanating from any point source, to flow into the waters of this state.

39.     W. Va. Code R. § 47-2-3.2.a derives its authority from the WPCA and provides that no sewage, industrial wastes or other wastes present in State waters shall cause or materially contribute to distinctly visible floating or settle-able solids, scum, foam or oily slicks in said Waters.

40.     W. Va. Code R. § 4-7-2-3.2.f derives its authority from the WPCA and provides that no sewage, industrial wastes or other wastes present in State waters shall cause or materially contribute to distinctly visible color in said waters.

41.     W. Va. Code R. § 47-10-3.1 derives its authority from the WPCA and requires persons to obtain a WV/NPDES Permit prior to constructing and/or operating a facility that discharges pollutants from a point source into the waters of the State.

42.     "Construction activity" means clearing, grading, and excavation that result in a land disturbance of equal to or greater than one (1) acre in size. Construction activity also includes disturbance of less than one (1) acre total land area that is part of a large common plan of development or sale if the common plan will ultimately disturb equal to or greater than one (1) acre. Construction activity does not include routine maintenance that is performed to maintain the original line and grade, hydraulic capacity, or original purpose of the facility. W. Va. Code R. 47-10-2.8.

43.     Section 22 of the WPCA, W. Va. Code § 22-11-22, authorizes WVDEP to commence a civil action for injunctive relief to compel compliance with and enjoin violations of any provision of the WPCA or any term or condition of an NPDES permit issued under the WPCA. Section 22 of the WPCA also provides that any person who violates any provision of an NPDES permit issued pursuant to Section 8 of the WPCA, W. Va. Code § 22-11-8, is subject to a civil penalty of up to $25,000 per day for each violation.

## GENERAL ALLEGATIONS

44.     From at least 2010 to the present, LPG and/or persons acting on behalf of or at the direction of LPG, operated equipment that cleared and graded approximately 30 to 35 acres at the Site.

45.     LPG and/or persons acting on behalf of or at the direction of LPG, operated equipment and conducted other activities that caused discharges to Coles Run and its tributaries

of (a) fill material, (b) storm water associated with construction activities, and (c) chemical cleaning agent/surfactants.

A. **Waters on the Site Are Waters of the United States and Waters of the State**

46.     Coles Run is a perennial water body.  It is classified as perennial on U.S. Geological Survey maps and included on maps prepared by the West Virginia State Addressing and Mapping Board ("SAMB").  Coles Run is a tributary of Cheat Lake and the Monongahela River, a traditionally navigable water.

47.     Coles Run is present both upstream and downstream from the filled portion of Coles Run.  Prior to construction and discharge of fill materials, Coles Run ran through the Site area.

48.     Upstream and downstream of the Site, Coles Run has a defined bed, banks, and ordinary high water mark.  During site visits, EPA inspectors confirmed that the SAMB mapping is generally correct and observed flowing water both upstream and downstream of the fill material.

49.     From the Site, Coles Run flows approximately 1.3 miles to Cheat Lake, which is an impounded portion of the Cheat River, an interstate waterway.

50.     There is a marina located at the outlet of Coles Run into Cheat Lake.

51.     Prior to the construction activities at the Site, several unnamed tributaries— specifically, Tributary A, Tributary B, and Tributary C—conveyed flow to Coles Run in the vicinity of the Site.  *See* Exhibit A (aerial photographs).

52.     Upstream of the Site, Tributary A flows in a southwest direction.  As of EPA's May 9, 2016 visit to the Site, the upstream portion of Tributary A remained unfilled and had a bed and banks and ordinary high water mark.  EPA inspectors observed water flowing in the

undisturbed portion of Tributary A upstream of the Site in November 2014 and May 2016. EPA inspectors also observed water flowing in a disturbed portion of Tributary A on the Site in May 2019. EPA reviewed information from its site visits, photographs from LPG's consultants, and digital topographic maps, and analyzed rainfall data and the drainage area to determine that Tributary A has more than precipitation-driven flow, i.e., Tributary A is fed by groundwater and flows continuously on at least a seasonal basis. Prior to the construction and discharge of fill materials, Tributary A was a perennial or intermittent water body that flowed into Coles Run within the Site boundaries.

53.     Upstream of the Site, Tributary B flows in a southeast direction. As of EPA's May 9, 2016 visit to the Site, the upstream portion of Tributary B remained unfilled and had a bed and banks and ordinary high water mark. EPA inspectors observed water flowing in the undisturbed portion of Tributary B upstream of the Site in November 2014 and May 2016. EPA inspectors also observed water flowing in a disturbed portion of Tributary B on the Site in May 2019. EPA reviewed information from its site visits, photographs from LPG's consultants, and digital topographic maps, and analyzed rainfall data and the drainage area to determine that Tributary B has more than precipitation-driven flow, i.e., Tributary B is fed by groundwater and flows continuously on at least a seasonal basis. Prior to the construction and discharge of fill materials, Tributary B was a perennial or intermittent water body that flowed into Coles Run within the Site boundaries.

54.     Tributary C flows in a southwest direction before joining Coles Run. Prior to the construction and discharge of fill materials, Tributary C was a perennial or intermittent water body that extended several hundred feet further upstream within the Site. As of EPA's May 9, 2016 visit to the Site, the remaining downstream portion of Tributary C remained unfilled and

had a bed and banks and ordinary high water mark. EPA inspectors observed flowing water in the downstream portion of Tributary C during site visits in November 2014, May 2016, and May 2019. EPA reviewed information from its site visits, photographs from LPG's consultants, and digital topographic maps, and analyzed rainfall data and the drainage area to determine that Tributary C has more than precipitation-driven flow, i.e., Tributary C is fed by groundwater and flows continuously on at least a seasonal basis.

55.     Coles Run, Tributary A, Tributary B, and Tributary C are "waters of the United States" within the meaning of Section 502(7) of the Clean Water Act, 33 U.S.C. § 1362(7), 40 C.F.R. §§ 122.2 (1993) & 232.2 (1993), and 40 C.F.R. § 120.2 (effective June 22, 2020). Coles Run, Tributary A, Tributary B, and Tributary C are also waters of the State within the meaning of Section 3 of the WPCA, W. Va. Code Ann. § 22-11-3(23).

**B.  Unauthorized Discharges of Dredged and/or Fill Material**

56.     LPG and/or persons acting on behalf of, or at the direction of, LPG operated equipment that discharged dredged and/or fill material to a portion of Coles Run, and rerouted that portion of Coles Run into a culvert under the Site. In addition, LPG and/or persons acting on behalf of, or at the direction of, LPG operated equipment that discharged dredged and/or fill material resulting in the filling and/or rerouting of Tributary A, Tributary B, and Tributary C.

57.     During construction activities at the Site, LPG discharged dredged and/or fill material into approximately 1,100 linear feet of Coles Run and diverted the flow for this length through a culvert running under the Site.

58.     After installation of the culvert, water from the upstream portion of Coles Run enters the culvert, passes under the Site, discharges from the culvert into a scour pool, and then flows into the downstream portion of Coles Run to Cheat Lake.

59.     A second culvert, which carries the storm water collected from the inlets and storm drains of the Site's storm water collection system (discussed in more detail below), also discharges into the scour pool.

60.     During construction activities at the Site, LPG discharged dredged and/or fill material into approximately 280 linear feet of Tributary A. The filled portion of Tributary A was rerouted into a culvert that runs under the Site and connects to the culvert that carries water from Coles Run.

61.     During construction activities at the Site, LPG discharged dredged and/or fill material into approximately 700 linear feet of Tributary B. The filled portion of Tributary B was rerouted into a ditch along the northeast boundary of the Site which flows into a culvert that runs under the Site and discharges into Coles Run.

62.     During construction activities at the Site, LPG discharged dredged and/or fill material into approximately 440 linear feet of the upstream portion of Tributary C and rerouted that portion of Tributary C into a culvert running under the Site.

## C.  Unauthorized Discharges of Construction Storm Water

63.     Between November 1, 2007, and May 18, 2012, LPG did not have an NPDES permit authorizing discharges of storm water associated with construction activity or small construction activity from the Site.

64.     When LPG developed the Site, LPG installed a storm water collection system to manage storm water run-off. On the interior areas of the Site, LPG installed a number of drop inlets and storm drains to collect and convey storm water via a system of culverts to the scour pool at the downstream edge of Coles Run. On the perimeter of the Site, a system of man-made

open ditches and covered culverts collects and conveys storm water from the Site and discharges it into Coles Run.

65.    On September 16, 2010, sediment-laden water discharged into Coles Run from the culverts running under the Site caused visible floating and/or settle-able solids in Coles Run.

66.    On September 30, 2010, sediment-laden water discharged into Coles Run from the culverts running under the Site caused visible floating and/or settle-able solids in Coles Run and downstream in Cheat Lake.

67.    On May 18, 2012, WVDEP issued LPG an individual NPDES Permit (Permit No. WV0116599) (hereinafter, "Permit") for discharges associated with construction activity or small construction activity from the Site that required LPG to, among other things:

    a.   Limit its discharges to purely storm water (with limited exceptions not applicable here) (Permit Section C.01 & 07);

    b.   Sample the run off from the Site for iron and total suspended solids (Permit Part A and Section C.15);

    c.   Report the concentration and/or values of iron and total suspended solids discharged from the Site to WVDEP (Permit Parts A and C);

    d.   Develop and implement a Stormwater Pollution Prevention Plan ("SWPPP") to control the discharge of stormwater related to construction activity from the site. The Permit requires that the SWPPP contain and LPG implement certain specified elements, such as erosion and sediment controls including vegetative controls and structural controls. Among the SWPPP elements required by the Permit are:

        i.   Initiate stabilization measures, such as seed and mulch, on portions of the Site where construction activities had temporarily or permanently

14

ceased for greater than seven days and would not resume within twenty-one (21) days (Permit Section D.06.a)

    ii.    Immediately reseed areas where seed failed to germinate adequately within thirty (30) days after seeding and mulching (Permit Section D.06.a.3); and

    iii.    Protect fill slopes by measures designed to divert runoff to conveyance measures (such as pipe slope drains or stable channels) (Permit Section D.06.b.6).

    iv.    No sediment-laden water discharged from the Site without going through an appropriate best management practice (Permit Section D.06.b.10).

68.    On September 11, 2012, WVDEP officials performed an inspection of the Site and observed the following violations:

a.    LPG allowed sediment-laden water to leave the Site and cause visible floating or settle-able solids in Coles Run;

b.    LPG failed to prevent sediment-laden water from leaving the Site without going through an appropriate Best Management Practice;

c.    LPG was not in compliance with its Storm Water Pollution Plan, which was required and had been approved pursuant to the terms of its Permit. Specifically:

    i.    Sediment and erosion control devices were not in place;

    ii.    A settling pond ("Pond One") was not properly installed in the specified location; and

    iii.    Pond One had been removed prior to the Site being stabilized;

15

      iv.   LPG failed to initiate stabilization measures, such as seed and mulch, on portions of the Site where construction activities had temporarily or permanently ceased for greater than seven days and would not resume within twenty-one (21) days;

      v.   LPG failed to immediately reseed areas where seed failed to germinate adequately within thirty (30) days after seeding and mulching; and

      vi.   LPG failed to protect fill slopes by measures used to divert runoff to conveyance measures (such as pipe slope drains or stable channels).

d.   Construction operations were occurring outside of the authorized limits of disturbance.

69.   On January 28, 2013, WVDEP officials performed an inspection at the Site and observed the following:

a.   Sediment-laden water was leaving the Site and causing visible floating or settle-able solids in Coles Run;

b.   Fill materials from the LPG Site were placed in Coles Run; and

c.   LPG failed to operate and maintain proper erosion and sediment controls throughout the Site in order to prevent sediment-laden water from leaving the Site and entering Coles Run without going through an appropriate Best Management Practice.

70.   Between the issuance of LPG's Permit and April 16, 2017, LPG failed to submit the required discharge monitoring reports detailing LPG's sampling results for total dissolved solids and iron, in violation of the terms of LPG's Permit.

71.     During an inspection of the Site on May 9, 2016, representatives of EPA observed numerous instances of discharges of sediment-laden storm water associated with construction activity or small construction activity in violation of LPG's permit.  The EPA representatives observed portions of an unstabilized, nearly 90-degree vertical cut into a hillside along the northwest boundary of the Site ("vertical cut") slide off the face of the vertical cut and fall to the ground, where the sediment was then carried in storm water by way of man-made ditches and culverts to waters of the United States without first passing through an appropriate Best Management Practice.

**D.  Unauthorized Discharges of Chemical Cleaning Agent/Surfactants**

72.     From November 1, 2007, to the present, LPG did not have a permit authorizing the discharge of any pollutant other than construction storm water.

73.     The storm drains on the Site connect to the collection system pipes/culverts that run under the Site and that discharge to Coles Run.

74.     Tenants in the Mon Fayette Industrial Park use chemical agents and surfactants to clean pipes, trucks and other equipment at the Site.

75.     On January 28, 2013, WVDEP officials performed an inspection at the Site and observed workers using a chemical cleaning agent/solvent to wash grease from pipes; the waste water from the cleaning process flowed into storm drains and/or the collection system pipes/culverts.

76.     On or about January 28, 2013, a distinct odor resembling cleaning agents/surfactants and/or grease products was detected at the outfall pipes leaving the LPG Site and entering Coles Run.

77.     During an inspection of the Site on May 9, 2016, representatives of EPA observed workers using chemical cleaning agents/surfactants to clean pipes.  These chemical cleaning agents/surfactants mixed with wash water flowed to a nearby storm water grate and/or the collection system pipes/culvert.

78.     During an inspection of the Site on May 7, 2019, representatives of EPA observed staining on the concrete pad near the northeast corner of the Site as well as a rainbow-colored sheen in water pooled at the bottom of a nearby drop inlet that was accompanied by an odor of hydrocarbons.  EPA representatives detected a similar, but fainter, odor of hydrocarbons when they inspected the outfall pipes leaving the LPG Site and discharging into Coles Run.

## FIRST CLAIM FOR RELIEF

### Unauthorized Discharges of Construction Storm Water

79.     Plaintiffs reallege and incorporate by reference the allegations set forth in Paragraphs 1 through 78.

80.     As alleged in Paragraphs 63-66 above, on numerous occasions, "storm water associated with industrial activity," within the meaning of CWA Section 402(p)(2)(B), 33 U.S.C. § 1342(p)(2)(B), and 40 C.F.R. § 122.26, specifically, stormwater associated with construction activity, was discharged from point sources at the Site to "waters of the United States" and "navigable waters" under CWA Section 502(7), 33 U.S.C. § 1362(7).

81.     Storm water discharges associated with construction activity such as clearing and grading constitute discharges from a "point source" for purposes of the CWA and therefore require a NPDES permit, 33 U.S.C. § 1342(p); 40 C.F.R. §§ 122.1 & 122.26.

82.     Storm water discharges associated with construction activity require a permit for the purposes of WPCA Sections 3 and 8, W. Va. Code § 22-11-3(15); W. Va. Code § 22-11-8.

83.     The discharges of storm water associated with construction activity described in the Paragraphs above constituted unauthorized and unpermitted discharges of a pollutant within the meaning of CWA Section 301, 33 U.S.C. § 1311, and CWA Section 502(12), 33 U.S.C. § 1362(12).

84.     The discharges of storm water associated with construction activity described in the Paragraphs above constituted discharges of a pollutant within the meaning of Sections 3 and 8 of the WPCA, W. Va. Code § 22-11-3(16);  W. Va. Code § 22-11-8.

85.     Due to the discharge of storm water associated with construction activity to waters of the United States, and the waters of the State, without a permit, Defendant is liable to the United States and the State of West Virginia for injunctive relief and civil penalties under 33 U.S.C. § 1319(b) and (d), and W. Va. Code § 22-11-22.

## SECOND CLAIM FOR RELIEF

### Violations of NPDES Permit for Construction Storm Water

86.     Plaintiffs reallege and incorporate by reference Paragraphs 1 through 85 as if fully set forth within.

87.     LPG's Permit included limits on discharges and requirements relating to preventive maintenance, erosion and sediment control, structural storm water management systems, sampling, and reporting, as described in more detail above.

88.     As observed on September 11, 2012, January 28, 2013, and May 9, 2016, LPG violated its Permit by failing to prevent sediment laden water from leaving the Site and failing to implement its approved SWPPP by, among other things, failing to install appropriate vegetative and structural erosion and sediment controls; and engaging in construction activity part of a common plan of development outside the area of disturbance described in the permit.

89.     Upon information and belief, LPG violated its Permit on many other instances by, among other things, failing to install required erosion and sediment controls to prevent sediment-laden water from leaving the Site.

90.     Between May 18, 2012, and April 16, 2017, LPG failed to report required sampling results for total dissolved solids and iron in accordance with its Permit.

91.     Due to LPG's violations of the terms and conditions of its Permit for the discharge of storm water associated with construction activity, Defendant is liable to the United States and the State of West Virginia for injunctive relief and civil penalties under 33 U.S.C. § 1319(b) and (d), and W. Va. Code § 22-11-22.

## THIRD CLAIM FOR RELIEF

**Unauthorized Discharges of Chemical Cleaning Agents/Surfactants and Grease**

92.     Plaintiffs reallege and incorporate by reference Paragraphs 1 through 91 as if fully set forth within.

93.     An addition of a pollutant from a point source to a water of the United States, or a water of the State, requires a WV/NPDES permit. *See* 33 U.S.C. § 1311(a); W. Va. Code § 22-11-8.

94.     Chemical cleaning agents/surfactants and grease are "pollutants" as defined in CWA Section 502(6), 33 U.S.C. § 1362(6) and WPCA Section 3, W. Va. Code § 22-11-3(16).

95.     The collection system pipes/culverts constitute a point source for purposes of the CWA, 33 U.S.C. § 1362(14), and the WPCA, W. Va. Code § 22-11-3(15).

96.     The discharges described in Paragraphs 72-78 above constituted unauthorized "discharges of a pollutant" within the meaning of CWA Section 301, 33 U.S.C. § 1311, CWA Section 502(12), 33 U.S.C. § 1362(12), and WPCA Section 8, W. Va. Code § 22-11-8.

97.     Because LPG has discharged or allowed the discharge of cleaning agents/surfactants without a permit to waters of the United States, and the waters of the State, as alleged in the preceding Paragraphs, Defendant is liable to the United States, and the State of West Virginia, for injunctive relief and civil penalties under 33 U.S.C. § 1319(b) and (d), and W. Va. Code § 22-11-22.

## FOURTH CLAIM FOR RELIEF

### Unauthorized Discharges of Dredged and/or Fill Material in Violation of the CWA

98.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 97 as if fully set forth within.

99.     Through the activities described above, Defendant and/or persons acting on its behalf discharged dredged and/or fill material to waters of the United States.

100.     The dredged and/or fill material that Defendant discharged includes, among other things, dirt, rock and sand, all of which constitute "pollutants" as defined in CWA Section 502(6), 33 U.S.C. § 1362(6).

101.     Defendant and/or persons acting on its behalf used mechanized land-clearing and earth-moving equipment that resulted in the discharges at the Site. This equipment constitutes "point source[s]" as defined in Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

102.     The discharges of dredged and/or fill material described above constitute discharges of a pollutant within the meaning of CWA Section 301, 33 U.S.C. § 1311, and CWA Section 502(12), 33 U.S.C. § 1362(12).

103.     Defendant did not obtain a permit from the Secretary of the Army, acting through the Chief of Engineers, for the discharges of dredged and/or fill material into waters of the

United States at the Site, as required by CWA Sections 301(a) and 404, 33 U.S.C. §§ 1311(a) and 1344.

104.    Defendant has violated and continues to violate CWA Section 301(a), 33 U.S.C. § 1311(a), by its unauthorized discharges of pollutants, specifically dredged and/or fill material, to waters of the United States at the Site.

105.    The above-described unauthorized discharges of pollutants to waters of the United States constitute multiple violations at the Site, and each day that such material remains in place constitutes a separate violation of CWA Section 301(a), 33 U.S.C. § 1311(a).

106.    Unless enjoined, LPG's violations will continue.

107.    Due to Defendant's discharge of dredged and/or fill material to waters of the United States without a permit, Defendant is liable to the United States for injunctive relief and civil penalties.

## FIFTH CLAIM FOR RELIEF

### Unauthorized Discharges of Pollutants in Violation of the WPCA

108.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 107 as if fully set forth within.

109.    Through the activities described above, Defendant and/or persons acting on its behalf discharged dredged and/or fill material to waters of the State of West Virginia.

110.    The dredged and/or fill material that Defendant discharged includes, among other things, dirt, rock and sand, all of which constitute "pollutants" as defined in WPCA Section 3, W. Va. Code § 22-11-3(16).

111.    The discharges of dredged and/or fill material described above constitute discharges of a pollutant within the meaning of WPCA Section 3, W. Va. Code § 22-11-3(15).

112.     Defendant has violated and continues to violate WPCA Section 8, W. Va. Code § 22-11-8, by its unauthorized discharges of pollutants, specifically dredged and/or fill material, to waters of the State at the Site.

113.     Section 22 of the WPCA, W. Va. Code § 22-11-22, authorizes WVDEP to commence a civil action for injunctive relief to compel compliance with and enjoin violations of any provision of the WPCA.  Section 22 of the WPCA also provides that any person who violates any provision of the WPCA is subject to a civil penalty of up to $25,000 per day for each violation.

114.     Unless enjoined, LPG's violations will continue.

115.     Due to Defendant's discharge of pollutants, including sand, dirt and rock, to waters of the State of West Virginia without a permit, Defendant is liable to the State of West Virginia for injunctive relief and civil penalties.

**PRAYER FOR RELIEF**

WHEREFORE, based upon all the allegations contained in Paragraphs 1 through 115 above, the United States of America and the State of West Virginia request that this Court:

1.     Order Defendant to comply with the CWA and WPCA and their implementing regulations and the terms of any permit issued thereunder;

2.     Permanently enjoin Defendant from discharging or causing the discharge of dredged and/or fill material or other pollutants to any water of the United States or water of the State except in compliance with a permit or permits issued pursuant to the CWA and WPCA;

3.     Order Defendant to undertake measures, at Defendant's own expense and at the direction of EPA and/or the United States Army Corps of Engineers, in cooperation with WVDEP, to effect complete restoration of waters of the United States, and the waters of the

State, at the Site and/or to conduct on-site and/or off-site mitigation for unauthorized impacts to waters of the United States, and the waters of the State, as appropriate;

      4.     Order Defendant to pay civil penalties, pursuant to CWA Section 309(d), 33 U.S.C. § 1319(d), for each day of each violation of CWA Section 301(a);

      5.     Order Defendant to pay civil penalties, pursuant to WPCA, W. Va. Code § 22-11-22, for each day of each violation of WPCA Section 8, W. Va. Code § 22-11-8;

      6.     Award Plaintiffs their costs of this action; and

      7.     Grant such other relief as the Court deems just and proper.

Dated:

                  Respectfully submitted,

                  FOR THE UNITED STATES OF AMERICA

                  JEAN E. WILLIAMS
                  Acting Assistant Attorney General
                  Environment and Natural Resources Division
                  United States Department of Justice

                    */s/ Thomas P. Kolkin*
                  THOMAS P. KOLKIN
                  Environmental Enforcement Section
                  Environment and Natural Resources Division
                  United States Department of Justice
                  P.O. Box 7611
                  Washington, D.C. 20044-7611
                  (202) 305-0427
                  (202) 514-0097 (fax)
                  thomas.kolkin@usdoj.gov
                  (*pro hac vice* motion pending)

_/s/ Austin D. Saylor_
AUSTIN D. SAYLOR
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20004-7611
(202) 598-7867
(202) 514-8865 (fax)
austin.saylor@usdoj.gov
(_pro hac vice_ motion pending)

_/s/ Sonya J. Shea_
SONYA J. SHEA
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Defense Section
999 18th Street
South Terrace, Suite 370
(303) 844-7231
(303) 844-1350 (fax)
sonya.shea@usdoj.gov
(_pro hac vice_ motion pending)

RANDOLPH J. BERNARD
Acting United States Attorney
Northern District of West Virginia


*/s/ Christopher Prezioso*
CHRISTOPHER PREZIOSO
WV State Bar No. 9384
Assistant United States Attorney
United States Attorney's Office
P.O. Box 591
Wheeling, WV 26003
(304) 234-0100

FOR THE STATE OF WEST VIRGINIA, by and through the WEST VIRGINIA DEPARTMENT OF ENVIRONMENTAL PROTECTION


KATHY EMERY
Director
Division of Water and Waste Management
West Virginia Department of Environmental Protection


By Counsel:

_ _ _/s/ Andrew F. Tarr_ _ _ _ _ _ _ _ _
ANDREW F. TARR
WV State Bar No. 5033
West Virginia Department of Environmental Protection
Office of Legal Services
601 57th Street SE
Charleston, WV 25304
(304) 926-0460
Drew.F.Tarr@wv.gov